**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| Lori Stevens-Fowler, | § | |
| Plaintiff, | § | |
| | § | CASE NO. 5:21-cv-00253 |
| | § | |
| v. | § | |
| | § | |
| Experian Information Solutions, Inc.; Ally | § | |
| Financial Inc.; Conn Appliances, Inc.; | § | |
| First Premier Bank; Go Federal Credit | § | |
| Union; Sun Loan Company, Inc.; and | § | |
| DOES 1 through 100 inclusive, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Defendants. | § | |

COMES NOW Plaintiff **LORI STEVENS-FOWLER** ("Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1.      This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debts included in Plaintiff's Chapter 7 bankruptcy.

2.      Defendant Ally Financial Inc. ("Ally"), Defendant Conn Appliances, Inc. ("Conn"), Defendant First Premier Bank ("First Premier"), Defendant Go Federal Credit Union ("Go FCU"), and Defendant Sun Loan Company, Inc. ("Sun Loan") are not reporting Plaintiff's accounts accurately; each of which were included and discharged in bankruptcy.

3.      The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

//

4.      A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5.      The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6.      In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7.      Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetrate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8.      Creditors know that deviating from recognized credit reporting standards will make it difficult for consumers to raise their credit scores and improve their creditworthiness.

9.      This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. § 1681.

12.     This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13.     Plaintiff alleges that, for purposes of establishing residency under 28 U.S.C. § 1391(b)(1), each of the named Defendants conducts sufficient business within the forum state and this Court has personal jurisdiction over each Defendant under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

//

//

//

## GENERAL ALLEGATIONS

14.     Plaintiff alleges that the Ally, Conn, First Premier, Go FCU, and Sun Loan accounts were each included in Plaintiff's Chapter 7 bankruptcy filing in that the debts occurred pre-petition and were subsequently discharged.

15.     Plaintiff alleges that a "CO" or charge off is a one-time event, and a single debt cannot be charged off repeatedly.

16.     Experian states that a "'Charge Off' means that the credit grantor wrote your account off of their receivables as a loss, and it is closed to future charges." A credit grantor is not allowed to write off a single debt twice as that would be afoul of the Internal Revenue Service. It is technically inaccurate to report a "charge off" every month, because the data furnisher cannot write an account off on their receivables on a continues basis. *See* https://www.experian.com/blogs/ask-experian/what-does-charge-off-mean/.

17.     Once a debt is charged off, the payment history of that debt cannot be updated on a monthly basis to "continue to reflect the charge off". This type of reporting cannot be acceptable under the FCRA as, in addition to being patently incorrect, the repeated charge offs compound the derogatory impact as seen by the tally of the total number of charge offs on a given account which is listed in the account summary.

18.     Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

19.     Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

20.     Plaintiff alleges that all of Defendants' actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair her FICO Score.

21.     In the alternative, Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

//

//

## FACTUAL BACKGROUND

22.     Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.     FICO, Inc.**

23.     FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to their analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

24.     The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

25.     A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

26.     Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

27.     Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

28.     There are twenty-eight (28) FICO Scores that are commonly used by lenders.

29.     A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

30.     The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

31.     FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

32.     There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

33.     Each of the five (5) factors is weighted differently by FICO.

34.     In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates

to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

35.     Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

36.     Repeated derogatory payment history (e.g., repeated monthly "CO" notations) increases the recency and frequency calculation; therefore, repeated negative items in the payment history is more sever and detrimental to a FICO Score.

37.     In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

38.     Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

39.     FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

40.     The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

41.     A FICO Score is a summary of your credit report. In simple terms, the FICO Score is calculated by taking the five (5) factors (payment history, amount of debt, length of credit history, new credit, and credit mix) for each account in a credit report and calculating a three digit number for lenders to review. "When you apply for credit, lenders need a fast and consistent way to decide whether or not to loan you money." *See https://www.myfico.com/credit-education/what-is-a-fico-score.* If a lender or employer did look past the FICO Score into a consumer's reports, chances are they either do not understand the tradeline meanings themselves, or, if they do and realize something appears incorrect, they are incapable of recalculating the complex mathematical algorithms in a FICO Score to take the found error into consideration. Therefore, most lenders and employers do not review individual accounts, just a consumer's FICO Score (or average of FICO Scores) in order to make "quicker decisions". *See Id.*

**B.      Metro 2**

42.     The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

43.     The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

44.     The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting. While CDIA's Metro 2 format is intended to standardize credit reporting, this standard is still subject to the FCRA's requirement of *maximum possible accuracy and completeness.*

45.     The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

46.     The CDIA is an expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

a.      The CDIA offers a FCRA certificate program for all CRAs.

b.      The CDIA offers a FCRA awareness program for all CRAs.

c.      The CDIA offers a FCRA certificate program for DFs.

d.      The CDIA offers a FCRA awareness program for DFs.

e.      The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

f.      The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.      The CDIA developed a credit reporting resource guide for accurately reporting credit.

47.     The CDIA's Metro 2 format is accepted by all CRAs.

48.     The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

49.     The CRRG outlines the industry standards for accurately reporting debts using Metro 2 format.

50.     The CRRG is not readily available to the public. It can be purchased for $229.45.

51.     Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will not grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

52.     When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

53.     The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

54.     If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.      e-OSCAR**

55.     e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

56.     When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

57.     The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.      Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

58.     When a consumer files bankruptcy, certain credit reporting industry standards exist.

59.     Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

60.     The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

61.     Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

62.     It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

63.     In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

64.     CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

65.     The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

66.     The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

67.     The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

68.     The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

69.     The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

70.     Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent *in personam* collection activity.

71.     Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

72.     The FRCA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was *filed*.

73.     A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

//

74.     The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

75.     Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

**E.     Plaintiff's Debts were Discharged Pursuant to her Bankruptcy**

76.     Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on August 1, 2019 in order to repair her creditworthiness and FICO Score.

77.     Plaintiff listed Ally, Conn, First Premier, Go FCU, and Sun Loan on Schedule E/F of her bankruptcy petition as each holding a nonpriority unsecured claim.

78.     Plaintiff's bankruptcy was discharged on November 6, 2019.

**F.     Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

79.     On October 29, 2020, Plaintiff ordered a three-bureau credit report from Experian to ensure proper reporting by Plaintiff's creditors (the "October 29 Credit Reports").

80.     Plaintiff noticed adverse tradelines in her October 29 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

81.     Plaintiff then disputed the inaccurate tradelines via certified mail to Experian on or about December 9, 2020 (the "Dispute Letter").

82.     Plaintiff's Dispute Letter specifically put Ally, Conn, First Premier, Go FCU, and Sun Loan on notice that Plaintiff filed for bankruptcy, received a bankruptcy discharge, and that Plaintiff's respective accounts should each be updated post discharge.

83.     Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the accounts, addressing each tradeline individually.

84.     Plaintiff requested that any derogatory reporting be updated to ensure accuracy and completeness of the accounts as required by the FCRA.

85.     Plaintiff is informed and believes that Experian received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to Ally, Conn, First Premier, Go FCU, and Sun Loan, as the data furnishers, via an ACDV through e-OSCAR.

//

86.     On January 15, 2021, Plaintiff ordered a second three-bureau credit report from Experian to determine if her accounts were updated.

**a.     Inaccuracy – Ally**

87.     Despite actual knowledge, Defendant Ally continued to report Plaintiff's account, beginning in 084919XXXXXX, to Experian with a current payment status of "Charge-off", a current balance of "$7,520", a past due amount of "$7,520", and a post-discharge "CO" for charge off in January of 2021. Further, Ally is not reporting Plaintiff's bankruptcy discharge.

88.     Plaintiff alleges that Ally did not investigate whether Plaintiff filed for bankruptcy.

89.     Ally did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy.

90.     Experian provided notice to Ally that Plaintiff was disputing the inaccurate and misleading information, but Ally failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

91.     Based on Plaintiff's dispute, along with multiple notices received throughout the bankruptcy, Ally should have known that Plaintiff received a discharge in her bankruptcy proceedings.

92.     The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a bankruptcy.

93.     Plaintiff alleges that Ally did not review well-established industry standards for credit reporting.

94.     If Ally reviewed such standards, Ally would have seen that its reporting of a charge off post discharge, a charge off payment status, an outstanding balance, and a past due amount on a debt discharged in bankruptcy was not in compliance and was therefore patently inaccurate or incomplete.

95.     Ally should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy.

96.     By continuing to report Plaintiff's account to Experian as described in paragraph 87, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is currently behind on her payment obligations and that this debt was not discharged in her bankruptcy. Further, as this inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone

being what most lenders use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

97.     The lack of investigation and reporting of inaccurate and incomplete information by Ally is unreasonable.

**b.     Inaccuracy – Conn**

98.     Despite actual knowledge, Defendant Conn continued to report one of Plaintiff's accounts, beginning in 434157XXX ("Conn's Account #1"), to Experian with a current payment status of "Charge-off", a current balance of "$1,307", a past due amount of "$1,307", and "CO" for charge off for each month from December of 2015 through December of 2020 (excepting only October of 2019). This payment history is inaccurate as a debt can only be charged off one time and not recurring on a monthly basis. Further, Conn is not reporting Plaintiff's bankruptcy discharge.

99.     Despite actual knowledge, Defendant Conn continued to report a second account of Plaintiff's, beginning in 434157XXX ("Conn's Account #2"), to Experian with a "CO" for charge off for each month from February of 2016 through July of 2019. This payment history is inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

100.     Plaintiff alleges that Conn knew Plaintiff had filed for bankruptcy as proven by its bankruptcy reference reported on Conn's Account #2; however, Conn did not update the tradelines to reflect that Plaintiff obtained a discharge in bankruptcy on Account #1. Further, Conn did not remove the multiple charge offs, including those reported post-discharge.

101.     The Conn's Account #1 account summary directly under the Conn account name header on Plaintiff's credit report says, "60 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

102.     The Conn's Account #2 account summary directly under the Conn account name header on Plaintiff's credit report says, "42 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

//

//

103.   Experian provided notice to Conn that Plaintiff was disputing the inaccurate and misleading information, but Conn failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

104.   Based on Plaintiff's dispute, along with multiple notices received throughout the bankruptcy, Conn should have known that Plaintiff received a discharge in her bankruptcy proceedings.

105.   The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a bankruptcy (and that a creditor is not supposed to report post discharge).

106.   Plaintiff alleges that Conn did not review well-established industry standards for credit reporting.

107.   If Conn reviewed such standards, Conn would have seen that in regard to Conn's Account #1, its reporting of multiple and repeated charge offs on a single debt, charge offs post discharge, a charge off payment status, an outstanding balance, and a past due amount on a debt discharged in bankruptcy was not in compliance and was therefore patently inaccurate or incomplete.

108.   Further, if Conn reviewed such standards, Conn would have seen that in regard to Conn's Account #2, its reporting of multiple and repeated charge offs on a single debt was not in compliance and was therefore patently inaccurate or incomplete.

109.   In regards to Conn's Account #1, Conn should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy.

110.   By continuing to report Plaintiff's Conn's Account #1 as described in paragraph 98, it incorrectly appears to third parties viewing Plaintiff's credit report that Plaintiff is currently behind on her payment obligations and that this debt was not discharged in her bankruptcy. As this inaccurate reporting is being used to calculate Plaintiff's FICO Score, the FICO Score alone being what most lenders use to determine Plaintiff's creditworthiness, it is misleading in such a way as to adversely affect credit decisions.

111.   Further, by continuing to report Plaintiff's Conn's Account #1 with a "CO" for charge off for each month from December of 2015 through December of 2020 (excepting only October of 2019), and continuing to report Plaintiff's Conn's Account #2 with a "CO" for charge off for each month from February of 2016 through July of 2019, Conn is compounding the

derogatory impact on Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

112.    Conn can write off a single debt only once; however, it reported a monthly charge off for sixty (60) straight months (excepting 1 single month in October of 2019) for Conn's Account #1 and for forty-two (42) straight months for Conn's Account #2. This reporting is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and her ability to obtain new credit.

113.    As payment history (where the multiple charge offs are being reported) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect and repeated "CO" payment history reported by Conn on two separate accounts is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit

114.    Conn's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

**c.    Inaccuracy – First Premier**

115.    Despite actual knowledge, Defendant First Premier continued to report Plaintiff's account, beginning in 517800XXXXXXXXXX, to Experian with a "CO" for charge off for each month from December of 2017 through July of 2019. This payment history is inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

116.    First Premier did not update the tradeline to remove the multiple charge offs.

117.    The account summary directly under the First Premier account name header on Plaintiff's credit report says, "20 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

118.    Experian provided notice to First Premier that Plaintiff was disputing the inaccurate and misleading information, but First Premier failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

119.    Plaintiff alleges that First Premier did not review if duplicated reporting of a single charge off complies with the maximum possible accuracy and completeness standard of the FCRA.

120.    If First Premier reviewed such standards, First Premier would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

121.    By continuing to report Plaintiff's account with a "CO" for charge off for each month from December of 2017 through July of 2019, First Premier is compounding the derogatory impact on Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

122.    First Premier can write off the debt only once; however, it reported a monthly charge off for twenty (20) straight months. This is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and her ability to obtain new credit.

123.    As payment history (where the multiple charge offs are being reported) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect and repeated "CO" payment history reported by First Premier is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

124.    First Premier's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

### d.    Inaccuracy – Go FCU

125.    Despite actual knowledge, Go FCU continued to report one of Plaintiff's account, beginning in 102970XXXX ("Go FCU Account #1"), to Experian with a "CO" for charge off for each month from October of 2015 through July of 2019. This payment history is inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

126.    Despite actual knowledge, Go FCU continued to report a second account of Plaintiff's, beginning in 102970XXXX ("Go FCU Account #2"), to Experian with a "CO" for charge off for each month from October of 2015 through July of 2019. This payment history is inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

127.    Go FCU did not update the tradelines on either account to remove the multiple charge offs.

128.    The Go FCU Account #1 account summary directly under the Go FCU account name header on Plaintiff's credit report says, "46 charge-offs". This type of reporting is patently

inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

129. The Go FCU Account #2 account summary directly under the Go FCU account name header on Plaintiff's credit report says, "46 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

130. Experian provided notice to Go FCU that Plaintiff was disputing the inaccurate and misleading information, but Go FCU failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

131. Plaintiff alleges that Go FCU did not review if duplicated reporting of a single charge off complies with the maximum possible accuracy and completeness standard of the FCRA.

132. If Go FCU reviewed such standards, Go FCU would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

133. By continuing to report Plaintiff's Go FCU Account #1 with a "CO" for charge off for each month from October of 2015 through July of 2019, it is compounding the derogatory impact on Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

134. In addition, by continuing to report Plaintiff's Go FCU Account #2 with a "CO" for charge off for each month from October of 2015 through July of 2019, it is compounding the derogatory impact on Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit

135. Go FCU can write off each of the debts only once; however, it reported a monthly charge off for forty-six (46) straight months for each account. This is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and her ability to obtain new credit.

136. As payment history (where the multiple charge offs are being reported) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect and repeated "CO" payment history reported by Go FCU is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

137.    Go FCU's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

**e.    Inaccuracy – Sun Loan**

138.    Despite actual knowledge, Defendant Sun Loan continued to report Plaintiff's account, beginning in 1XXXX, to Experian with a "CO" for charge off for each month from November of 2015 through July of 2019. This payment history is inaccurate as a debt can only be charged off one time and not recurring on a monthly basis.

139.    Sun Loan did not update the tradeline to remove the multiple charge offs.

140.    The account summary directly under the Sun Loan account name header on Plaintiff's credit report says, "45 charge-offs". This type of reporting is patently inaccurate and each of these charge offs is increasing the frequency and recency of the derogatory reporting, and therefore, compounding the negative impact of Plaintiff's FICO Score.

141.    Experian provided notice to Sun Loan that Plaintiff was disputing the inaccurate and misleading information, but Sun Loan failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

142.    Plaintiff alleges that Sun Loan did not review if duplicated reporting of a single charge off complies with the maximum possible accuracy and completeness standard of the FCRA.

143.    If Sun Loan reviewed such standards, Sun Loan would have seen that its reporting was not in compliance and was therefore patently inaccurate or incomplete.

144.    By continuing to report Plaintiff's account with a "CO" for charge off for each month from November of 2015 through July of 2019, it is compounding the derogatory impact on Plaintiff's FICO Score. This type of reporting has adversely affected Plaintiff when potential lenders were making credit decisions regarding Plaintiff and their willingness to extend credit.

145.    Sun Loan can write off the debt only once; however, it reported a monthly charge off for forty-five (45) straight months. This is inaccurate and misleading and causes specific harm to Plaintiff's FICO score and her ability to obtain new credit.

146.    As payment history (where the multiple charge offs are being reported) makes up thirty-five percent (35%) of a consumer's FICO Score, and as most lenders approve or deny credit based on a consumer's credit score (as opposed to pouring through each tradeline of every account listed to obtain context), the incorrect and repeated "CO" payment history reported by Sun Loan is lowering Plaintiff's credit score, which adversely affects Plaintiff's ability to obtain credit.

147.   Sun Loan's lack of investigation is unreasonable, and its reporting is negatively impacting Plaintiff's credit score.

**G.   Damages**

148.   Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

149.   As a result of the incorrect reporting, Plaintiff has also suffered emotional harm, physical sickness, and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

150.   Plaintiff has been denied credit and is unable to rebuild her credit based on the inaccurate reporting by Defendants.

151.   Ally's, Conn's, First Premier's, Go FCU's, and Sun Loan's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))

### (Against Defendants and Does 1-100)

152.   Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Experian Failed to Assure Credit Reporting Accuracy**

153.   Experian violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

154.   Had Experian maintained reasonable procedures to assure maximum accuracy, it would never have never allowed Ally, Conn, First Premier, Go FCU, or Sun Loan to report their respective accounts as described herein.

155.   Experian knew, or should have known, (1) that the Ally account and the Conn's Account #1 were both included and discharged in bankruptcy, and (2) the Ally account and Conn's Account #1 should not have been reported as described in herein, on account of the Chapter 7 discharge. Further, Experian knew, or should have known, that this inaccurate and incomplete tradeline does not reflect *maximum possible accuracy and completeness* as required by the FCRA.

156.   In addition, Experian knew, or should have known, (1) that the Conn accounts, First Premier account, Go FCU accounts, and Sun Loan account could each only be charged off once

as the same debt cannot be charged off each month on a continuous basis, and (2) that reporting a charge off on each account month after month was increasing the frequency and recency of the derogatory reporting which was having a compounding, negative effect on Plaintiff's FICO Score. It is stated on Experian's own website that a "charge off" is a "write off" by a data furnisher. Further, Experian knew, or should have known, that these inaccurate and incomplete tradelines do not reflect *maximum possible accuracy and completeness* as required by the FCRA.

157.    Experian is trying to have its cake and eat it too. On one hand, it wants to allow data furnishers to inaccurately and misleadingly report multiple charge offs on a consumer's credit report, and on the other, it provides conflicting information to consumers when it states "the credit grantor wrote your account off of their receivables as a loss, and it is closed to future charges." Specifically, in this case, Experian allowed inaccurate and misleading information, the rolling charge off, to be reported on Plaintiff's credit report that has damaged her reputation.

158.    Congress specifically recognized the "elaborate mechanism developed for investigating and evaluating credit worthiness, credit standing, credit capacity, character, and general reputation of consumers." *Nayab v. Capital One Bank (USA), NA*, 942 F. 3d 480, 492 (9th Cir. 2019). The investigation and evaluation of Plaintiff's credit worthiness, credit standing, credit capacity, character and general reputation as a consumer are all damaged by the rolling charge offs that Experian allowed.

159.    As a result of Experian's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.    Willful Violations**

160.    Experian's violations, as described herein, were willful; specifically, Experian has intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

161.    Experian regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the disputes. Additionally, Experian regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

//

//

162.    To the extent Experian does send consumer disputes, it sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

163.    Experian's employees receive little to no training concerning how to accurately report consumer debt.

164.    Instead, Experian's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

165.    Experian's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

166.    Experian has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

167.    As a result of Experian's violations of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

168.    Experian's violations were willful, rendering it liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

169.    In the alternative, Experian was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

170.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Experian in an amount to be determined by this Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**SECOND CAUSE OF ACTION**

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

171.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Ally and Conn Each Failed to Reinvestigate Following Plaintiff's Dispute**

172.    Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable

cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

173.    Ally and Conn each violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading, inaccurate, and incomplete account information.

174.    Experian provided notice to Ally and Conn that Plaintiff was disputing the inaccurate and misleading information; however, Ally and Conn each failed to conduct a reasonable investigation as required by the FCRA.

175.    Based on Plaintiff's dispute, Ally should have known its account was included in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting of a charge off current payment status, outstanding balance, past due amount, and post-discharge charge off payment history.

176.    Based on Plaintiff's dispute, Conn should have known Conn's Account #1 was included in Plaintiff's Chapter 7 bankruptcy and ceased its inaccurate reporting of a charge off current payment status, outstanding balance, past due amount, and post-discharge charge off payment history.

177.    As an account which has been discharged in bankruptcy is no longer collectable by the creditor or owed by the debtor, reporting a discharged account as a charge off, with a balance, and past due amount is patently incorrect. In addition, this inaccurate reporting also adversely affects credit decisions. Payment history (including payment status), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context. Therefore, Ally's reporting, and Conn's reporting on Conn's Account #1, of "charge-off" payment status, an outstanding balance, a past due amount, and post-discharge "CO" payment history on debts discharged and no longer owed by Plaintiff has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

178.    The lack of investigation by Ally and Conn, as required by the FCRA, is unreasonable.

//

//

//

**B.**     **Conn, First Premier, Go FCU, and Sun Loan Each Failed to Reinvestigate Following Plaintiff's Dispute**

179.     Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

180.     Conn, First Premier, Go FCU, and Sun Loan each violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading, inaccurate, and incomplete account information.

181.     Experian provided notice to Conn, First Premier, Go FCU, and Sun Loan that Plaintiff was disputing the misleading, inaccurate, and incomplete information on their respective accounts; however, Conn, First Premier, Go FCU, and Sun Loan each failed to conduct a reasonable investigation as required by the FCRA.

182.     Based on Plaintiff's dispute, Conn should have known its accounts could not each be charged off multiple times on a monthly basis and ceased its inaccurate reporting. Further, Conn understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

183.     Based on Plaintiff's dispute, First Premier should have known its account could not be charged off multiple times on a monthly basis and ceased its inaccurate reporting. Further, First Premier understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

184.     Based on Plaintiff's dispute, Go FCU should have known its accounts could not each be charged off multiple times on a monthly basis and ceased its inaccurate reporting. Further, Go FCU understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

185.     Based on Plaintiff's dispute, Sun Loan should have known its account could not be charged off multiple times on a monthly basis and ceased its inaccurate reporting. Further, Sun Loan understands that frequency and recency of reporting in the payment history are directly tied to a factor which accounts for over one-third of a consumer's FICO Score calculation.

186.     A single debt can only be charged off one time and, if a debt is charged off, it should only be reported for a single month in which the debt was actually charged off. Once a debt is

charged off, the payment history reporting on that debt should cease (absent subsequent payment). As a single debt cannot be charged off multiple times, reporting as such is patently incorrect.

187.    This type of inaccurate reporting can also adversely affect credit decisions. Payment history (where the multiple charge off notations are being reported), at thirty-five percent (35%), is the heaviest weighted factor that goes into calculating a FICO score. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. If a charge off is repeated for months on end, it is increasing the frequency of derogatory payment history as well as the recency; both compounding to lower a FICO Score. Most lenders, employers, and other individuals who access a consumer's credit report approve or deny credit or employment based upon the reported FICO Score and do not take the time to look through each tradeline of every account listed to obtain context.

188.    Based upon the foregoing, Plaintiff alleges Conn's reporting of multiple charge offs of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

189.    Based upon the foregoing, Plaintiff alleges First Premier's reporting of multiple charge offs of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

190.    Based upon the foregoing, Plaintiff alleges Go FCU's reporting of multiple charge offs of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

191.    Based upon the foregoing, Plaintiff alleges Sun Loan's reporting of multiple charge offs of the same debt throughout the payment history of a single account has a direct adverse effect on Plaintiff's FICO Score and her ability to obtain credit.

192.    Conn's, First Premier's, Go FCU's, and Sun Loan's lack of investigation, as required by the FCRA, is unreasonable.

**C.    Willful Violations**

193.    Plaintiff further alleges that Ally, Conn, First Premier, Go FCU, and Sun Loan have not properly trained those directly investigating disputes on Metro 2 generally, credit reporting industry standards, or the accuracy and completeness FCRA standard and, as such, have developed reckless policies and procedures.

//

194.    Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, Ally's, Conn's, First Premier's, Go FCU's, and Sun Loan's employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

195.    Creditors like Ally, Conn, First Premier, Go FCU, and Sun Loan commonly use credit reporting as a means of deemed "retribution" upon consumers who do not or cannot pay. Thus, Plaintiff alleges Conn's, First Premier's, Go FCU's, and Sun Loan's respective reporting as described herein is an attempt to have the most detrimental impact on her FICO Score, and, due to the factors and weights which comprise a FICO Score, each are succeeding in doing so by the increased frequency and recency of derogatory charge off notations. Further, Ally's and Conn's inaccurate reporting of discharged debts, including post discharge reporting payment history, is having a direct detrimental impact on Plaintiff's FICO Score.

196.    In the alternative, Ally, Conn, First Premier, Go FCU, and Sun Loan were each negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

**D.    Experian Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

197.    Pursuant to 15 U.S.C. 1681i(a)(1), Experian was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Ally, Conn, First Premier, Go FCU, and Sun Loan accounts.

198.    Thus, Experian failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the accounts within the statutory time frame.

199.    Experian is not a passive entity bound to report whatever information a data furnisher provides.

200.    Plaintiff alleges Experian is readily familiar with Metro 2 guidelines and credit reporting industry standards.

201.    Based on the foregoing, Plaintiff alleges that Experian can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

202.    Experian can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

//

//

203.    Experian failed to conduct a reasonable investigation because any basic investigation would have uncovered that Ally, Conn, First Premier, Go FCU, and Sun Loan were not reporting their respective accounts at issue correctly.

204.    Had Experian conducted a proper investigation it could have removed the multiple, monthly charge offs on each of the Conn, First Premier, Go FCU, and Sun Loan accounts, and it could have closed or bookended the Ally account and Conn's Account #1 by adding a notation on the credit report on its tradeline that the debts were in fact included and discharged in Plaintiff's Chapter 7.

205.    Experian, therefore, did not conduct even the most basic investigations regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

### THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

206.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Experian Failed to Review and Consider all Relevant Information**

207.    Experian violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

208.    Experian's violations of 15 U.S.C. § 1681i(a)(4) have caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

209.    Experian's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

210.    In the alternative, Experian was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

211.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//

## FOURTH CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))

### (Against Defendants and Does 1-100)

212.    Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    Experian Failed to Delete Disputed and Inaccurate Information**

213.    Experian violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

214.    Experian's violations of 15 U.S.C. § 1681i(a)(5)(A) have resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

215.    Experian's violations were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

216.    In the alternative, Experian was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

217.    Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

//

//

//

//

//

//

//

//

//

//

//

## PRAYER FOR RELIEF

218. WHEREFORE, Plaintiff prays for judgment as follows:

    a.  For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

    b.  Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

    c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

    d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

    e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

    f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**SCHUMACHER LANE PLLC**

Dated: March 12, 2021

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.


**SCHUMACHER LANE PLLC**


Dated: March 12, 2021                    */s/ Kyle Schumacher*
                                         Kyle Schumacher
                                         Attorney for Plaintiff